IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs October 27, 2004 Session

## STATE OF TENNESSEE, DEPARTMENT OF CHILDREN'S SERVICES
## v. B.B.M.

Appeal from the Juvenile Court for Hancock County
No. 12753 through 12756      Mindy Norton Seals, Judge

No. E2004-00491-COA-R3-PT - FILED NOVEMBER 17, 2004

This appeal involves the Juvenile Court's termination of the parental rights of B.B.M. ("Mother") to her four children. After a trial, the Juvenile Court held there was clear and convincing evidence that DCS had made a reasonable effort to assist Mother to reunite with her children. The Juvenile Court also concluded that DCS had proven by clear and convincing evidence that Mother's parental rights should be terminated on three separate grounds. Finally, the Juvenile Court held there was clear and convincing evidence that termination of Mother's parental rights was in the children's best interest. The record on appeal is lacking in many respects and does not contain even the permanency plans developed by DCS to assist Mother in the unsuccessful attempt to reunite her with her children. We conclude the record, such as it is, does not contain sufficient evidence to support the Juvenile Court's conclusion that there was clear and convincing evidence that DCS had made a reasonable effort to assist Mother to reunite with her children. The judgment of the Juvenile Court is, therefore, reversed.

### Tenn. R. App. P. 3 Appeal as of Right; Judgment of the
### Juvenile Court Reversed; Case Remanded

D. MICHAEL SWINEY, J., delivered the opinion of the court, in which HERSCHEL P. FRANKS, P.J., and SHARON G. LEE, J., joined.

Scott A. Hodge, Morristown, Tennessee, for the Appellant B.B.M.

Paul G. Summers, Attorney General and Reporter, and Douglas Earl Dimond, Senior Counsel, Nashville, Tennessee, for the Appellee State of Tennessee, Department of Children's Services.

## OPINION

## Background

This litigation began in August of 1998 when DCS filed a Petition for Temporary Custody of Mother's four children, who then were ages 1, 3, 6, and 8. In the petition, DCS claimed the children were dependent and neglected because both parents, who were divorced and living apart, had lost their homes and were unable to care for the children. Apparently, the children's father had placed them with various relatives who no longer were able to care adequately for them. Along with the petition, DCS filed an Affidavit of Reasonable Efforts setting forth what efforts had been made to prevent removing the children from their home. The Juvenile Court granted the petition and awarded DCS temporary custody. In April and July of 1999, temporary custody of three of the four children was returned to the father on a "trial home placement." Although the record contains no order returning temporary custody of the fourth child to the father, the Juvenile Court's final judgment stated "that is in fact what occurred."

DCS filed a second Petition for Temporary Custody in May of 2000, claiming all four children once again were dependent and neglected. With regard to the father, DCS alleged he had a "lengthy alcohol dependency problem," although he had expressed an intention to seek treatment. With regard to Mother, DCS stated she was receiving Social Security disability benefits for "mental problems" and was not an available resource for placement of the children. No Affidavit of Reasonable Efforts was filed by DCS or, if one was filed, it is not contained in the record on appeal. The Juvenile Court apparently granted the petition and awarded DCS temporary custody, but the order granting the petition likewise is not in the record.

In August of 2000, Mother filed a Petition seeking custody of all four children. She asserted that she was in a position to provide proper care for her children. According to Mother, she was remarried and living in a three bedroom home. Mother noted that she was receiving a Social Security disability check for a physical disability, not a mental disability, and that her new husband was actively employed building homes.

On May 11, 2001, DCS filed a motion asking the Juvenile Court to review "the necessity of continued foster care, the appropriateness of the placement, the extent of compliance of all parties with the terms of the foster care plan, the extent of progress made in achieving the goal of the plan, and the future status of the children." DCS also filed a Notice stating the review would be heard by the Juvenile Court on May 22, 2001. The record contains no information regarding what happened at the review, or if it even happened.

The next document in the record is a combined motion and order dated September 5, 2001, which restored full legal custody of the two oldest children to their father on a "trial home placement" effective November 29, 2001. In the meantime, DCS filed another motion requesting that the Juvenile Court review the current foster care situation and the parents' progress in completing the terms of their permanency plans. DCS filed a Notice saying this review would take

place on September 12, 2001. Once again, the record contains no information regarding what happened at the review hearing, assuming it even took place.

On November 21, 2001, the Juvenile Court entered an Order declaring that the two older children continued to be dependent. This was eight days before custody of the two older children was to be returned to the father per the September 5, 2001, order. Custody of the two older children never was returned to the father because he officially surrendered his parental rights to all four children on November 14, 2001.

On February 25, 2002, DCS filed another motion asking the Juvenile Court to review "the necessity of continued foster care, the appropriateness of the placement, the extent of compliance of all parties with the terms of the foster care plan, the extent of progress made in achieving the goal of the plan, and the future status of the child[ren]." A guardian ad litem was appointed on the children's behalf on February 27, 2002. One month later, the guardian ad litem filed a report with the Juvenile Court recommending, among other things, that the children remain in foster care at least until Mother completed the terms of her permanency plan. On March 27, 2002, the Juvenile Court conducted a hearing to review the status of the foster care placement and Mother's compliance with the terms of the permanency plan. Following this hearing, the Juvenile Court entered an Order continuing the current foster care placement and ordering Mother to complete the terms of the permanency plan by May 27, 2002.

The next pertinent document in the record is dated October 21, 2002, and is the petition to terminate Mother's parental rights to all four children. In this petition, DCS alleged, among other things, that: 1) the children had been removed from the home for at least six months and the conditions which led to their removal persisted; 2) there was little likelihood that these conditions would be remedied at an early date which would permit a safe return of the children to Mother; 3) Mother was unable to provide a suitable home for the children and had made no reasonable efforts to provide a suitable home; and 4) continuation of the parent/child relationship would greatly diminish the children's chances of early integration into a safe, stable and permanent home. DCS also alleged there had not been substantial compliance by Mother with the terms of "periodic foster care plans" or permanency plans. According to DCS, Mother had willfully abandoned the children by failing to visit or engaging only in token visitation with them and by refusing to pay child support for more than four consecutive months preceding the filing of the petition. Finally, DCS alleged it would be in the best interests of the children for Mother's parental rights to be terminated.

The next documents in the record pertain to the father's November 14, 2001, surrender of his parental rights and are not directly pertinent to this appeal. There are no documents in the record pertaining to Mother which were entered between the time DCS filed its petition to terminate Mother's parental rights on October 21, 2002, and the Juvenile Court's final judgment

granting that petition on January 28, 2004.[1]  In its final judgment, the Juvenile Court held there was sufficient evidence to terminate Mother's parental rights on three grounds.  Specifically, the Juvenile Court stated:

> [M]other's lack to provide a suitable home and demonstrated lack of concern for the children precluding an early return of the children to her care, conditions which led to the removal still persist, other conditions persist which would in all probability cause the children to be subjected to further abuse and neglect and mother has failed to comply in a substantial manner with the permanency plan.  These grounds have been proven by clear and convincing evidence.

The Juvenile Court also held there was clear and convincing evidence that termination of Mother's parental rights was in the best interest of the children.

Mother appeals claiming there was no clear and convincing evidence to support terminating her parental rights on any of the three grounds relied upon by the Juvenile Court. Mother also claims there was no clear and convincing evidence to support a finding that termination of her parental rights was in the best interest of the children.  Mother also maintains the termination of her parental rights must be reversed because DCS did not exercise reasonable efforts on her behalf.

## Discussion

The factual findings of the Juvenile Court are accorded a presumption of correctness, and we will not overturn those factual findings unless the evidence preponderates against them.  *See* Tenn. R. App. P. 13(d); *Bogan v. Bogan*, 60 S.W.3d 721, 727 (Tenn. 2001).  With respect to legal issues, our review is conducted "under a pure *de novo* standard of review, according no deference to the conclusions of law made by the lower courts."  *Southern Constructors, Inc. v. Loudon County Bd. Of Educ.*, 58 S.W.3d 706, 710 (Tenn. 2001).  In *In re Adoption of T.A.M.*, No. M2003-02247-COA-R3-PT, 2004 Tenn. App. LEXIS 317 (Tenn. Ct. App. May 12, 2004), *no appl perm appeal filed*, this Court observed that:

> Because of the heightened burden of proof required by Tenn. Code Ann. § 36-1-113(c), we must adapt Tenn. R. App. P. 13(d)'s customary standard of review for cases of this sort.  First, we must review the trial court's specific findings of fact de novo in accordance with Tenn. R. App. P. 13(d).  Thus, each of the trial court's specific factual findings will be presumed to be correct unless the evidence

---

[1] The one document filed during this time period was the order on the March 27, 2002, hearing.  The order pertaining to this hearing actually was signed by the Juvenile Court on November 13, 2002, but was entered nunc pro tunc to March 27.

preponderates otherwise. Second, we must determine whether the facts, either as found by the trial court or as supported by the preponderance of the evidence, clearly and convincingly establish the grounds for terminating the biological parent's parental rights. *Jones v. Garrett*, 92 S.W.3d at 838; *In re Valentine*, 79 S.W.3d at 546; *Ray v. Ray*, 83 S.W.3d at 733; *In re L.S.W.*, 2001 Tenn. App. LEXIS 659, No. M2000-01935-COA-R3-JV, 2001 WL 1013079, at *5 (Tenn. Ct. App. Sept. 6, 2001), *perm. app. denied* (Tenn. Dec. 27, 2001).

*In re Adoption of T.A.M.,* 2004 Tenn. App. LEXIS 317, at ** 8-9 (footnote omitted).

In *Dep't of Children's Servs. v. D.G.S.L.*, this Court discussed the relevant burden of proof in cases involving termination of parental rights. Specifically, we observed:

It is well established that "parents have a fundamental right to the care, custody, and control of their children.*"* *In re Drinnon*, 776 S.W.2d 96, 97 (Tenn. Ct. App. 1988) (citing *Stanley v. Illinois*, 405 U.S. 645, 92 S. Ct. 1208, 31 L. Ed. 2d 551 (1972)). "However, this right is not absolute and parental rights may be terminated if there is clear and convincing evidence justifying such termination under the applicable statute." *Id.* (citing *Santosky v. Kramer*, 455 U.S. 745, 102 S. Ct. 1388, 71 L. Ed. 2d 599 (1982)).

Termination of parental or guardianship rights must be based upon a finding by the court that: (1) the grounds for termination of parental or guardianship rights have been established by clear and convincing evidence; and (2) termination of the parent's or guardian's rights is in the best interests of the child. Tenn. Code Ann. § 36-1-113(c). Before a parent's rights can be terminated, it must be shown that the parent is unfit or substantial harm to the child will result if parental rights are not terminated. *In re Swanson*, 2 S.W.3d 180, 188 (Tenn. 1999); *In re M.W.A., Jr.*, 980 S.W.2d 620, 622 (Tenn. Ct. App. 1998). Similarly, before the court may inquire as to whether termination of parental rights is in the best interests of the child, the court must first determine that the grounds for termination have been established by clear and convincing evidence. Tenn. Code Ann. § 36-1-113(c).…

*Dep't of Children's Servs. v. D.G.S.L.*, No. E2001-00742-COA-R3-JV, 2001 Tenn. App. LEXIS 941, at **16-17 (Tenn. Ct. App. Dec. 28, 2001), *no appl. perm. appeal filed.*

Termination of parental rights may be based upon a number of statutory grounds. The statutory provisions relied upon by the Juvenile Court provide that parental rights can be terminated for the following reasons:

(1) Abandonment by the parent or guardian, a defined in § 36-1-102, has occurred;

(2) There has been substantial noncompliance by the parent or guardian with the statement of responsibilities in a permanency plan or a plan of care pursuant to the provisions of title 37, chapter 2, part 4;

(3)(A) The child has been removed from the home of the parent or guardian by order of a court for a period of six (6) months and:

(i) The conditions which led to the child's removal or other conditions which in all reasonable probability would cause the child to be subjected to further abuse or neglect and which, therefore, prevent the child's safe return to the care of the parent(s) or guardian(s), still persist;

(ii) There is little likelihood that these conditions will be remedied at an early date so that the child can be safely returned to the parent(s) or guardian(s) in the near future; and

(iii) The continuation of the parent or guardian and child relationship greatly diminishes the child's chances of early integration into a safe, stable and permanent home.

Tenn. Code Ann. §§ 36-1-113(g)(1) through (g)(3) (Supp. 2004).

As relevant to this appeal, Tenn. Code Ann. § 36-1-102(1)(A)(ii) defines abandonment as follows:

The child has been removed from the home of the parent(s) or guardian(s) as the result of a petition filed in the juvenile court in which the child was found to be a dependent and neglected child, as defined in § 37-1-102, and the child was placed in the custody of the department or a licensed child-placing agency, that the juvenile court found, or the court where the termination of parental rights petition is filed finds, that the department or a licensed child-placing agency made reasonable efforts to prevent removal of the child or that the circumstances of the child's situation prevented reasonable efforts

from being made prior to the child's removal; and for a period of four (4) months following the removal, the department or agency has made reasonable efforts to assist the parent(s) or guardian(s) to establish a suitable home for the child, but that the parent(s) or guardian(s) have made no reasonable efforts to provide a suitable home and have demonstrated a lack of concern for the child to such a degree that it appears unlikely that they will be able to provide a suitable home for the child at an early date.

In the present case, the Juvenile Court found there was clear and convincing evidence that the statutory grounds for termination in Tenn. Code Ann. §§ 36-1-113(g)(1) through (g)(3) had been met. Clear and convincing evidence supporting any single ground will support a termination order. *See In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002).

Initially, we note that there were at least two permanency plans prepared for Mother by DCS and approved by the Juvenile Court. Generally, permanency plans are designed, *inter alia*, to assist the parent in taking the necessary steps to be reunited with his or her child and so the parent can provide a safe environment for the child's eventual return. We already have mentioned the significant lack of information contained in the record on appeal. In addition to what we already have noted, and much to this Court's consternation, neither of the permanency plans are in the record. Due to the heightened burden of proof necessitated by the constitutional ramifications of forever terminating a parent's rights to his or her child, we believe it is the responsibility of DCS to ensure that this critical information is contained in the record on appeal.

One of the grounds for terminating Mother's parental rights was the Juvenile Court's factual conclusion that Mother failed to substantially comply with the statement of responsibilities contained in her permanency plans. In its final judgment the Juvenile Court did set forth many of the requirements contained in Mother's most recent permanency plan. However, without the ability to actually review all the requirements of the permanency plan because we have no way of even knowing what all the requirements were, we cannot and will not affirm the conclusion that Mother failed to substantially comply with these requirements of the plan. Because we are effectively precluded from reviewing whether Mother did or did not substantially comply with the terms of her permanency plan, the Juvenile Court's conclusion that she did not must be reversed.

Permanency plans typically provide this Court with much relevant information, or at least they do when they are included in the record. Not only do the plans provide this Court with the various requirements the parent must complete in order to be reunited with his or her children, but they usually contain information on assistance that has been provided to the parent by DCS with the hope of enabling the parent to achieve the goal of reunification. One of Mother's claims on appeal is that DCS failed to provide her with adequate assistance in achieving the goal of reunification.

In the recent case of *In re C. LaC. and D.L.*, No. M2003-02164-COA-R3-PT, 2004 Tenn. App. LEXIS 172 (Tenn. Ct. App. Mar. 17, 2004), *no appl. perm. appeal filed*, this Court observed that:

> Before we evaluate whether there is sufficient evidence to establish the grounds for termination, we must ascertain whether the Department made reasonable efforts to prevent the need for removal and thereafter to return the children safely to their home for this is not a case where reasonable efforts are excused. Unless remaining with the parent exposes the children to substantial risk of harm, the Department must make reasonable efforts to prevent the need for removal of the children prior to separating the children from the family, Tenn. Code Ann. § 37-1-166(a)(1), and thereafter to return the children to their home unless it exposes the children to substantial harm. Tenn. Code Ann. § 37-1-166(a)(2); Tenn. Code Ann. § 37-1-166(g)(2).

> The Department must establish by clear and convincing evidence that it made reasonable efforts to reunite the children with the parent. *In re Valentine*, 79 S.W.3d at 546; *In re C.M.M. & S.D.M.*, 2004 Tenn. App. LEXIS 160, No. M2003-01122-COA-R3-PT, 2004 WL at *11, (Tenn. Ct. App. March 9, 2004); Tenn. Code Ann. § 36-1-113(c). This burden requires that the Department present sufficient evidence to enable us to conclude, without serious or substantial doubt, that the efforts were reasonable under the circumstances. *In re Valentine*, 79 S.W.3d at 546; *Walton v. Young*, 950 S.W.2d 956, 960 (Tenn. 1997); *In re C.D.B.*, 37 S.W.3d 925, 927 (Tenn. Ct. App. 2000).

*In re C. LaC. and D.L.*, 2004 Tenn. App. LEXIS 172, at ** 14-16.[2]

In the present case, the Juvenile Court made no finding, nor is it alleged, that DCS was excused from providing reasonable efforts because the children would be exposed to a risk of substantial harm if they were reunited with Mother. This conclusion is supported by the express

---

[2] We went on to add that DCS "is not required to make reasonable efforts every time it removes a child. In certain aggravated circumstances, such as severe child abuse, the Department is relieved of this duty. Tenn. Code Ann. 37-1-102, Tenn. Code Ann. 37-1-166(g)(4) and Tenn. Code Ann. 36-1-113(g)(7)." *In re C. LaC. and D.L.*, 2004 Tenn. App. LEXIS 172, at * 15 n.5. *See also In Re C.M.M. & S.D.M.*, No. M2003-01122-COA-R3-PT, 2004 Tenn. App. LEXIS 160, at * 28 n.26 (Tenn. Ct. App. Mar. 9, 2004), *no appl. perm. appeal filed,* ("Termination proceedings based on the grounds in Tenn. Code Ann. § 36-1-113(g)(4) - (8) usually will not require the Department to demonstrate that it has made reasonable efforts to reunite a child with his or her parents.").

finding of the Juvenile Court that "DCS case managers used reasonable efforts in assisting mother in the reunification process until the time of the termination petition."

In *In Re C.M.M. & S.D.M.*, No. M2003-01122-COA-R3-PT, 2004 Tenn. App. LEXIS 160 (Tenn. Ct. App. Mar. 9, 2004), *no appl. perm appeal filed*, this Court noted that what constitutes reasonable efforts will vary on a case-by-case basis, and courts should consider, among other things, "(1) the reasons for separating the parent from his or her child or children, (2) the parent's physical and mental abilities, (3) the resources available to the parent, (4) the parent's efforts to remedy the conditions that required the separation, (5) the resources available to the Department, (6) the duration of the parent's remedial efforts, and (7) the closeness of the fit between the conditions that led to the initial separation, the requirements in the permanency plan, and the Department's efforts." 2004 Tenn. App. LEXIS 160, at *26. We went on to add:

> In many circumstances, the success of a parent's remedial efforts is intertwined with the efforts of the Department's staff to provide assistance and support. *State Dep't of Children's Servs. v. Demarr*, 2003 Tenn. App. LEXIS 569, 2003 WL 21946726, at *10. Reasonable efforts entail more than simply providing parents with a list of service providers and sending them on their way. The Department's employees must use their superior insight and training to assist parents with the problems the Department has identified in the permanency plan, whether the parents ask for assistance or not. *In re D.V.V.*, 2002 Tenn. App. LEXIS 126, 2002 WL 225891, at *8. However, the remedial responsibility does not rest solely on the Department's shoulders. Parents must also make reasonable efforts to rehabilitate themselves and to remedy the conditions that required them to be separated from their children. *In re R.C.V.*, 2002 Tenn. App. LEXIS 811, 2002 WL 31730899, at *12.

*In Re C.M.M. & S.D.M.*, 2004 Tenn. App. LEXIS 160, at ** 27-28.

Before we discuss the remaining grounds for termination of Mother's parental rights, we will review the trial testimony and other evidence contained in the record regarding the reasonable efforts provided by DCS case managers. Carol Maxey, a former DCS employee, testified at trial that she left the employment of DCS in December of 2000. Maxey testified she developed a permanency plan on Mother's behalf and went over that plan in detail with Mother.[3] Maxey stated that she informed Mother that she would have to undergo mental health counseling and that she (i.e., Maxey) made appointments for Mother. By the time of trial Maxey had not seen Mother's file in three and one-half years and did not have access to any documentation she may have prepared while

---

[3] It is unclear whether the permanency plan developed by Maxey followed the first or second petition for temporary custody filed by DCS. The permanency plan referenced by the Juvenile Court in the final judgment was developed well over a year after Maxey left the employ of DCS.

assisting Mother. According to Maxey, this information would be contained in the DCS file. None of this information is in the record on appeal.

Leanne Holcomb ("Holcomb") was the DCS case manager for Mother and her children from May 1, 2002, until May 12, 2003. Holcomb testified she made several appointments for counseling on Mother's behalf and went over the terms of the permanency plan with Mother. Holcomb testified she discussed the housing situation with Mother. When asked if she discussed a time table for Mother to complete the necessary changes to her housing situation, Holcomb stated it needed to be done as soon as possible, but "that was kind of after the fact to me when I got the case because the Judge had already given the May 27th, 2002 deadline so really they were past the deadline." Holcomb testified she discussed with Mother what needed to be done concerning her case, but she never sent Mother any correspondence explaining in writing what needed to be done. When questioned further about what reasonable efforts she made to assist Mother in obtaining suitable housing for the children, Holcomb stated:

> At the point when I got the case the kids had been in custody for five years and when I got the case we were already at the point of termination, so I feel like the Department did make reasonable efforts to try to help this family and help her. There's only so much we can do.… I can guide her and give her instruction on what she needs to do, but I don't hold her hand to have her do it.

> * * *

> At the time that I got the case I was instructed by Mr. Eidson to proceed with termination; that we would still focus on the Permanency Plan that was there, but to go ahead and proceed with the termination which is what I did. I continued to have the visits with [Mother], did the home visits, tried to help them get the testing done that needed to be done.

Jalana Clingan ("Clingan") was the DCS case manager assigned to this case following Holcomb's departure. When Clingan was assigned this case in June of 2003, the petition to terminate Mother's parental rights already had been filed. When Clingan was asked what reasonable efforts she made to reunite Mother and the four children, Clingan testified she supervised the hourly visits between Mother and the children. The following discussion than occurred between Clingan and the guardian ad litem:

> Q.     Okay. And you testified earlier that you really haven't made any efforts for reunification?

> A.     No.

-10-

Q. And will you explain to the Court why that is?

A. It was my understanding that she had until May 27th of 2002 to complete the, her goals on the Perm Plan. So when I got the case I was just waiting on termination, the termination date.

Q. So are you saying that it's departmental policy that after that time period has lapsed that you don't have to make any efforts whatsoever towards reunification after that time has lapsed?

A. No.

In summary, there is the testimony of Maxey who developed a permanency plan and made one or more appointments for Mother. This covers the time from when the children came into DCS custody up until December of 2000. There was no testimony or other evidence in the record regarding any reasonable efforts made by DCS from December of 2000 until Holcomb was assigned to the case in May of 2002. By that time, however, it was a *fait accompli* that DCS was going to seek to terminate Mother's parental rights and this clearly impacted the efforts made by Holcomb to assist Mother. It is for this very same reason that the next case worker, Clingan, admittedly made very little, if any, reasonable effort to assist Mother. In all fairness, we expect that DCS may have made other reasonable efforts to assist Mother in the reunification process. The problem again falls back to the inadequacy of the record on appeal. Were we to have the permanency plans and at least some of the DCS case file in the record, or testimony from the case manager assigned to the file after Maxey and before Holcomb, it certainly is possible that we would conclude that the evidence was clear and convincing that reasonable efforts had been made by DCS. However, this evidence is missing, and we refuse simply to assume reasonable efforts were taken by DCS on Mother's behalf when such a fundamental right is at stake.

We acknowledge that Tenn. Code Ann. § 37-1-166(g)(6) specifically provides that reasonable efforts to place a child for adoption can be made concurrently with reasonable efforts to make it possible for a child to safely return home. We do not interpret this statutory section to mean that reasonable efforts to return the child safely home need no longer be made once DCS makes the decision that it will proceed with termination proceedings at some point in the future. This duality behind the need for making reasonable efforts may account, at least in part, for Holcomb's and Clingan's admittedly lackluster efforts following the expiration of Mother's May 27, 2002 deadline. However, this also makes the need for testimony or other proof of reasonable efforts made by Mother's prior case managers even more necessary.

Having an adequate record on appeal is critical to this Court to enable it to review the judgment of the lower court, and is even more crucial when fundamental constitutional rights are at stake. Due to the unfortunate state of the record in the present case, we have in large part been precluded from effectively reviewing the judgment of the Juvenile Court. There is insufficient evidence before us to conclude that DCS proved by clear and convincing evidence that reasonable

efforts were made by DCS to assist Mother to reunite with her children. Accordingly, the judgment of the Juvenile Court is reversed and the remaining issues are pretermitted. On remand, DCS is instructed to develop a new permanency plan consistent with the children's and Mother's current situation.

## **Conclusion**

The judgment of the Juvenile Court is reversed, and this cause is remanded to the Juvenile Court for further proceedings as may be necessary, if any, consistent with this Opinion and for collection of the costs below. Costs on appeal are assessed against the Appellee State of Tennessee, Department of Children's Services.

_____
D. MICHAEL SWINEY, JUDGE